United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTIAN RUIZ BAPTISTE,

       Plaintiff,

    v.

LIDS; HAT WORLD, INC.; et al.,

       Defendants.

_____/

No. C 12-5209 PJH

**ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

    Defendants' motions for summary judgment came on for hearing before this court on
December 11, 2013.  Plaintiff Christian Ruiz Baptiste appeared by his counsel Derek C.
Decker; defendants Genesco, Inc. ("Genesco"), and Hat World, Inc. ("Hat World"),
appeared by their counsel Eric Meckley; and defendant Michael Somoon ("Somoon")
appeared by his counsel Daniel A. Croley.  Having read the parties' papers and carefully
considered their arguments and the relevant legal authority, the court hereby GRANTS the
motions as follows.

### BACKGROUND

    Plaintiff is a dark-skinned United States citizen of Puerto Rican and Haitian ancestry.
He was employed by Hat World at a LIDS store in San Francisco.[1]  Plaintiff's employment
with Hat World began on November 25, 2007, when he was hired as a part-time Sales
Associate at store number 5968 located on Market Street in San Francisco, California ("the

_____

[1] LIDS – which plaintiff named as a defendant – is not an independent entity, but rather
the name of stores owned and operated by Hat World (a wholly-owned subsidiary of Genesco).

United States District Court

For the Northern District of California

1  Market Street Store").  Deposition of Christian Ruiz Baptiste ("Baptiste Depo."), 52-55, Exh.

2  1; Declaration of Carrie Baird ("Baird Decl.") ¶ 2.

3      The then-Store Manager, Paul Pamatmat, considered plaintiff to be a "very

4  responsible and trustworthy individual."  Deposition of Paul Pamatmat ("Pamatmat Depo."),

5  52.  Both Mr. Pamatmat and Assistant Store Manager Jennifer Burket (since married and

6  changed last name to Watkins) recommended that plaintiff be promoted to the "Third Key"

7  at the Market Street Store.  Pamatmat Depo., 56; Declaration of Paul Pamatmat

8  ("Pamatmat Decl.") ¶ 3; Deposition of Jennifer Watkins ("Burket/Watkins Depo."), 9;

9  Deposition of Dale Nichols ("Nichols Depo."), 43-44.

10      Plaintiff was promoted to the Third Key position on April 25, 2008.  In this position,

11  he had duties and responsibilities as a Sales Associate plus the added responsibilities of

12  maintaining a key to the store, making sure inventory was stocked, counting cash, and

13  making cash deposits.  Baptiste Depo., 56, 69-71; Nichols Depo., 43-44; Baird Decl., ¶ 2.

14  Both Mr. Pamatmat and Ms. Burket were happy with plaintiff's performance, and found him

15  to be a good employee.  Pamatmat Decl. ¶ 3; Pamatmat Depo., 59-60; Burket/Watkins

16  Depo., 9, 63.

17      Plaintiff understood that his employment with Hat World was "at-will," and that Hat

18  World could terminate his employment for no reason.  Baptiste Depo., 229.  Plaintiff never

19  received a performance evaluation because he was employed for less than one year.

20  Baird Decl., ¶ 5.  However, he was also never written up or counseled for any performance

21  issues.  Baptiste Depo., 132; Burket/Watkins Depo., 10; Deposition of Carrie Baird ("Baird

22  Depo."), 36-38.

23      In July 2008, Somoon became the District Manager for Hat World's Northern

24  California and Nevada District, which included about 20 stores employing approximately

25  100 employees.  Cplt ¶ 14; Baptiste Depo., 99-100; Deposition of Michael Somoon

26  ("Somoon Depo."), 9, 14.  According to Somoon, each store under his jurisdiction could

27  typically expect to see him at least once a month.  Somoon Depo., 14.

28      The Market Street Store was one of the stores that came under Somoon's

2

United States District Court
For the Northern District of California

jurisdiction.  Plaintiff met Somoon only three times; and they never communicated via telephone, email, or text messaging.  Baptiste Depo., 145.  Plaintiff's first encounter with Somoon was in July 2008, when Somoon was at the Market Street Store for less than an hour.  Baptiste Depo., 100-101, 145-146.  When asked during his deposition, plaintiff initially did not remember having interacted with Somoon that day, other than an introduction and a handshake.  Baptiste Depo., 101-102, 106.  However, after resuming his testimony following a break in the deposition, plaintiff recalled that at some point during this encounter, "we were in front of the building and he [Somoon] had said, 'I don't like working with you people. . . . you are all thieves.'"  Baptiste Depo., 107-108, 116; Declaration of Christian Ruiz Baptiste ("Baptiste Decl.") ¶ 4.

Nevertheless, even after recalling this incident, plaintiff continued to testify that Somoon was "cordial" during this initial meeting:  "I thought that the first – the first time that I met with Somoon he was cordial and he wasn't harassing me at all. I know from the second to the third time that I met with him, he was harassing me."  Baptiste Depo., 110-112.  Plaintiff did not ask Somoon what he meant by "you people;" instead, he just "shook it off" and left.  Baptiste Depo., 117-118.

Plaintiff's second interaction with Somoon occurred when Somoon visited the Market Street Store in September 2008.  Baptiste Depo., 106-107; 124.  This visit lasted three to four hours.  Baptiste Depo., 107, 124, 145-146.  Plaintiff claims that while he was in the back room changing into his company work shirt, Somoon repeatedly hit him with the door, saying, "We're not paying you to get dressed, so hurry the fuck up."  According to plaintiff, this action intimidated him.  Baptiste Depo., 125-126; Baptiste Decl. ¶ 6.

Plaintiff testified further that during this visit, Somoon questioned him about why sales of discount cards were low and why test checks were showing a lot of missing merchandise.  Baptiste Depo., 127-131.  It was on this occasion that plaintiff claims Somoon called him a "lazy thug."  Baptiste Depo., 131-133; see also Baptiste Decl. ¶ 7. Plaintiff asserts that Somoon also commented that plaintiff "dressed ghetto," which plaintiff did not understand because all employees at the store dressed the same.  Baptiste Depo.,

United States District Court
For the Northern District of California

1    137-140.  However, plaintiff did not ask Somoon what he meant by "dressing ghetto."

2    Baptiste Depo., 139-140.

3        In addition, plaintiff asserts that Somoon "walked past me and whispered "nigger" in

4    my ear."  Baptiste Depo., 140.  Plaintiff could not recall where he was when Somoon made

5    this statement, but testified that Somoon muttered the word when walking past him.

6    Baptiste Depo., 140-144.  No one overheard Somoon make this comment.  Baptiste Depo.,

7    143.  Plaintiff was bothered by this comment, and it "threw [him] off his game."  Baptiste

8    Depo. 144-145.  However, plaintiff did not ask Somoon why he said "nigger," nor did he say

9    anything else to Somoon about this comment.  Baptiste Depo., 144.

10       Mr. Pamatmat testified that on that same occasion, Somoon stated that plaintiff

11   should not be the Third Key – that plaintiff was "lazy" and "not cut out for the job."

12   Pamatmat Depo., 75-79.  Mr. Pamatmat, on the other hand, felt that plaintiff was

13   trustworthy and "up to the job," and insisted that plaintiff was "honest," "professional," and

14   "a diligent employee."  Pamatmat Depo., 133-137; Pamatmat Decl. ¶ 3.

15       Mr. Pamatmat told plaintiff that Somoon was hostile towards him (plaintiff) and

16   wanted to fire him, and that plaintiff should watch out for Somoon.  Pamatmat Depo., 104-

17   106; Pamatmat Decl. ¶ 7; Baptiste Depo., 146-148.  Plaintiff asked Mr. Pamatmat why

18   Somoon didn't like him (plaintiff), and the response, according to plaintiff, was "'[H]e just

19   doesn't. . . . He doesn't want you here.  He wants to fire you.'"  Baptiste Depo., 148.

20   According to plaintiff, all this put him in fear of losing his job.  Baptiste Decl. ¶ 8.

21   Nevertheless, there is no evidence that plaintiff was looking for other employment during

22   this time.  Indeed, plaintiff testified that Mr. Pamatmat told him he was leaving Hat World for

23   other employment, and that if plaintiff wanted to come with him, "there's a spot for you."

24   Baptiste Depo., 149.  However, notwithstanding his dislike of Somoon's comments, plaintiff

25   responded, "'I'm fine here.  Like, as long as I don't keep running into Somoon, I'll be fine.'"

26   Baptiste Depo., 149.  Plaintiff added that he did not take Mr. Pamatmat up on his offer to go

27   work elsewhere because "I just got comfortable where I was at and I wanted to last at LIDS

28   a year, so it doesn't look funny when I, you know, go off to another place.  I want to try to

4

United States District Court
For the Northern District of California

have some type of consistency."  Baptiste Depo., 150.

The third time plaintiff had any communication with Somoon was October 29, 2008. Baptiste Depo., 145.  On that day, Somoon visited the Market Street Store to conduct a "Manager Change Audit" – an audit that was ordinarily conducted whenever a new store manager was starting.  Somoon Depo., 142-143; Baptiste Depo., 152.[2]

Prior to conducting this audit, Somoon had observed that inventories ("test checks") of specific sections of merchandise in the store had reflected discrepancies between the merchandise that should have been present in the store versus what was actually present. Somoon Depo., 127-129, 145.  In particular, Somoon questioned the accuracy of plaintiff's counts of the hats in the store's inventory.  Somoon Depo., 128.  About a week prior to the October 29, 2008, visit, Somoon reviewed the merchandise and inventories reported by plaintiff, and had noted several inaccuracies, which he discussed with the new store manager, David Eisen.  Somoon Depo., 127-130.

Somoon testified that he initially simply wanted Mr. Eisen to talk with plaintiff about the accuracy of his test checks.  Somoon Depo., 131, 146.  During the course of the audit, however, Somoon conducted an inventory count and verified that there was additional missing merchandise – and that "it was thousands of dollars' worth of missing product within a very short amount of time."  Somoon Depo., 148-149.   Plaintiff conceded in his deposition that Somoon was correct in concluding that there were hats missing from the store.  Baptiste Depo., 163-164.

In an effort to locate the merchandise, Somoon searched the store and found four hats in "what appeared to be like a satchel" in the back room.  Somoon Depo., 150, 153. The hats were "fashion hats . . . the expensive ones we had behind the counter."  Somoon Depo., 153.  According to Somoon, the hats had been worn and were dirty.  Somoon Depo., 153.  Ms. Burket, the Assistant Store Manager, identified the bag as belonging to

---

[2]  Store manager David Eisen was present at the Market Street Store during the events that occurred on October 29, 2008, but is not available because he died on December 9, 2012. However, before he died, he told the EEOC investigator that he did not hear much of the altercation between plaintiff and Somoon.  Def. Somoon's RJN, Exh. B.

United States District Court

For the Northern District of California

plaintiff.  Somoon Depo., 153-157; Burket/Watkins Depo., 25-27.

Somoon asked Ms. Burket if the hats were paid for, and she told him that as far as she knew, they were.  Burket/Watkins Depo., 28.  She also testified that she had no knowledge at that time that plaintiff was taking hats home without paying for them, although she agreed that when employees bought something from LIDS, their purchases for that store were kept in a file in the store.  Burket/Watkins Depo., 30.  Somoon testified that he reviewed plaintiff's purchase history file, but it did not reflect that plaintiff had purchased those particular hats.  Somoon Depo., 160.

Somoon testified that he called his supervisor, Regional Director Dale Nichols, to inform him that he was going to question plaintiff about the missing hats.  Somoon Depo., 170-171.  According to plaintiff, Somoon left the store and sat in a chair outside, in the mall's common area; he then came back into the store and told plaintiff he wanted to talk to him, and they both went to the seats in the mall, outside the store.  Baptiste Depo., 157-159.  Plaintiff testified that Somoon showed him a business card with some kind of police insignia on it, and said he used to be a police officer.  Baptiste Depo., 160-161.  He told plaintiff he "had evidence of me walking out with hats and stealing from the company." Baptiste Depo., 162.

Somoon also showed plaintiff an inventory report that showed a large number of hats were missing.  Baptiste Depo., 163.  Plaintiff responded that the hats were "probably stolen" but denied having stolen any of them; nevertheless, he accepted responsibility for approximately 12 of the missing hats.  Baptiste Depo., 164-166.  Plaintiff claims he did not take the hats, but that they must have been stolen by others during his shifts.  Baptiste Depo., 165-166.

Nevertheless, plaintiff agreed to write a statement accepting responsibility for the missing hats.  Baptiste Depo., 166.  Plaintiff testified that he "felt it was my responsibility as a store employee if something gets stolen on my shift or I feel something got stolen on my shift, then I should own up to it, just so we can figure out how to go about it; maybe pairing me up with someone else while I'm working, just to make sure we all – you know, there's

United States District Court
For the Northern District of California

1  more eyes out on the floor."  Baptiste Depo., 167.  However, while he felt that "was the right

2  thing to do," he was not going to admit to having stolen the hats himself, "[b]ecause I didn't

3  steal hats."  Baptiste Depo., 167.

4        According to plaintiff, after this interchange, Somoon told him he had the option of

5  either admitting to taking the hats or having the matter referred to the police – and that his

6  two police officer "buddies" were waiting downstairs, ready to arrest him.  Baptiste Depo.,

7  168.  Plaintiff initially said he would not sign anything admitting to theft, and claims that

8  Somoon took out a cell phone and told whoever was on the other end, "He's not

9  cooperating" and "you guys need to come up here."  Baptiste Depo., 169.

10        Somoon testified that he questioned plaintiff about why the hats were in the bag; and

11  that plaintiff initially denied stealing, but then he admitted "wearing the hats and trying 'em

12  out and wearing them to different parties and stuff and then bringing them back and

13  changing them out for something else that he wanted to wear out and things like."  Somoon

14  Depo., 175.  According to Somoon, plaintiff initially claimed he was just going to wear the

15  hats and return them, but that eventually, plaintiff admitted to taking hats without paying for

16  them, even selling or giving some to friends.  Somoon Depo., 175-178.  Somoon consulted

17  with the Human Resources ("HR") Department, the Company's Loss Prevention

18  Department, and his direct supervisor.  Per their recommendations, he called the San

19  Francisco Police Department ("SFPD") for assistance.  Somoon Depo., 175-178.

20        At that point, Somoon stepped away and plaintiff (who was still sitting outside the

21  store) called his mother on his cell phone.  Baptiste Depo., 169.  Somoon went back inside

22  the store and then came back outside, where plaintiff was still on the phone with his

23  mother.  Baptiste Depo., 170.  According to plaintiff, Somoon then talked to plaintiff's

24  mother on the phone, accusing plaintiff of theft.  Baptiste Depo., 170-171.  He claims

25  Somoon was shouting at her – "calling me a thief and a liar, and . . . telling my mom it's in

26  my best interest to just own up to it because he has all this evidence."  Baptiste Depo., 171.

27  "[H]e was calling me a liar; 'your son's a piece of shit.  You monkeys steal,' things like that."

28  Baptiste Depo., 171.

United States District Court

For the Northern District of California

1   When questioned further, however, plaintiff testified that he could not be certain that

2   Somoon used the word "monkey;" he could only say that Somoon "said some type of

3   derogatory statement about me and that I was a thief and that I couldn't be trusted."

4   Baptiste Depo., 171-172.  This conversation lasted about 5 minutes.  Baptiste Depo., 171.

5   Plaintiff could not hear what his mother said to Somoon, but he said he could hear her

6   yelling at Somoon.  Baptiste Depo., 175.

7   Plaintiff's mother, Esther Ruiz, testified in deposition that her son called her saying

8   Somoon "wanted him to sign a letter saying that he was stealing."  Deposition of Esther

9   Ruiz ("Ruiz Depo."), 36-37.  She also testified that someone who identified himself as

10   Somoon got on the phone with her "yelling and screaming that he [plaintiff] had to sign the

11   letter, that he had videotapes of him stealing, and that my son was nothing but a thief and

12   something about "you people" and on and on and on and on."  Ruiz Depo., 37.  She did

13   not, however, hear Somoon (or the person claiming to be Somoon) make any racially

14   derogatory remarks.  Ruiz. Depo., 59.

15   According to Ms. Ruiz, Somoon repeatedly told her, "He has to sign this.  He has to

16   sign this.  You, know he needs to sign this.  I don't care what happens.  He has to sign this

17   paper.  I know he's a thief."  Ruiz Depo., 38.  She thought Somoon was irrational, because

18   "I guarantee you my son is not a thief," and she told Somoon to call the police if he believed

19   plaintiff had been stealing.  Ruiz Depo., 39-40.  Somoon denies ever talking to plaintiff's

20   mother.  Somoon Depo., 190-191.

21   Somoon then told plaintiff to return to the store.  Plaintiff called his mother's friend,

22   Teresa Rodriguez, because "she knew somebody in the San Francisco Police

23   Department."  Baptiste Depo., 178-179.  Ms. Rodriguez testified in her deposition that she

24   spoke to Plaintiff on the phone on October 29, 2008.  She confirmed that plaintiff "told me

25   that his boss was accusing him of stealing, and since I know people in the law enforcement

26   and I used to work for a law firm myself for about four years . . . and he called me for

27   advice if I knew of a lawyer that I could call and ask what to do, because this – his boss

28   was accusing him of stealing."  Deposition of Teresa Rodriguez ("Rodriguez Depo."), 16.

United States District Court

For the Northern District of California

1    She advised him not to sign any statement admitting theft.  Rodriguez Depo., 17.

2        Meanwhile, two San Francisco Police Officers had responded to the call.  Baptiste

3    Depo., 181.  Plaintiff testified that he was in the back room (a very small storage room) and

4    that he observed Somoon talking to the officers.  Baptiste Depo., 183.  Somoon stayed

5    outside the store during his interaction with the SFPD officers.  Baptiste Depo., 183.

6        Plaintiff testified that one of the police officers came into the back room, bent his arm

7    behind his back and threw him up against a wall; that he yelled out in pain; that the officer

8    pushed his face into the wall and threatened to "break" his teeth if he cried out again; and

9    that the officer knocked the cell phone out of his hand.  Baptiste Depo., 183-185.

10   According to plaintiff, the officer then told him "that he deals with monkeys like me every

11   day; 'all you niggers steal. I don't care if you stole hats or not, just sign the piece of paper.'"

12   Baptiste Depo., 187-188.

13       Plaintiff testified that this encounter lasted two to three minutes.  Baptiste Depo.,

14   188-190.  The officer then left the back room and plaintiff followed.  Plaintiff did not hear

15   Somoon tell the officers he wanted them to do anything to plaintiff.

16       Ms. Rodriguez claims that after talking to plaintiff on the phone, she drove to the

17   Market Street Store to pick him up, and that when she was arriving, she saw a "bald man"

18   laughing with two police officers, across the street.  Rodriguez Depo., 28-29.  She could not

19   identify the race of the bald man.  She could not see the bald man's face, but plaintiff later

20   told her it was Somoon.  Rodriguez Depo., 34, 37-38, 86.

21       The two police officers who came to the Market Street Store on October 29, 2008

22   were Officer Noel Schwab and Officer Adam Street.  Officer Schwab testified that he and

23   his partner responded to a notification advising them that there was an issue of internal

24   theft.  Schwab Depo., 56-57.  Officer Schwab testified that plaintiff did not yell "ouch" (or

25   anything like it) during their interaction; he also denied swearing at plaintiff, threatening to

26   break his teeth, calling him racist names, or making any of the threats plaintiff detailed in

27   the complaint.  Schwab Depo., 24-28, 37-41.  Rather, he testified, it seemed to be a "pretty

28   calm situation when we got there;" Somoon was calm, and did not want to have plaintiff

United States District Court

For the Northern District of California

1    arrested but preferred to handle the matter "internally" within the company. Schwab Depo.,

2    27-28, 30. Officer Schwab denied having met Somoon before this incident, and did not

3    recall laughing with Somoon on the street after the incident. Schwab Depo., 16, 22, 44.

4        Officer Street testified that the officers met with plaintiff in the store's back room,

5    where they explained to him that he needed to sign a statement admitting to the theft or he

6    would be arrested. They left him alone to decide what to do, and, after a short time,

7    plaintiff told them he would sign a statement. Street Depo., 16-17. According to Officer

8    Street, Somoon's demeanor was calm and he was not yelling. Street Depo., 19-20. Officer

9    Street denied the physical altercation plaintiff alleges, and denied using any racial slurs.

10   Street Depo., 20-24, 30. He also testified that Somoon did not want to press charges if

11   plaintiff signed a statement admitting to the thefts. Street Depo., 29. He denied meeting

12   with Somoon on the street afterwards. Street Depo., 29-30.

13       After the officers left, plaintiff hand-wrote the following statement: "I Christian

14   Baptiste feel that its my responsibility to come clean about the following. In my eleven

15   months at the company I left the store with some hats that I did not pay for. I brought the

16   hats back." Baptiste Depo., 196-197; Exh. 5. Plaintiff testified that these were his own

17   words, and that the statement was true. Baptiste Depo., 198-199, 208. Somoon and Eisen

18   witnessed and signed this plaintiff's statement. Baptiste Depo., 207; Exh. 5.

19       According to plaintiff, he chose that particular wording because he wanted to

20   communicate that he occasionally left the store for only a few minutes, to use the restroom

21   or go to lunch, while wearing a hat he had not paid for. Baptiste Depo., 200-202.

22   Nevertheless, he conceded that he knew this was against company policy. Baptiste Depo.,

23   203. There is no testimony in plaintiff's deposition – or in the excerpts provided to the court

24   by the parties – to the effect that he believed he was authorized to wear hats out of the

25   store.

26       After plaintiff wrote the statement, he gave it to Somoon, although he refused to sign

27   it. Somoon then told Plaintiff "to leave and never come back or I would be accused of

28   trespassing." Somoon didn't say anything else. Plaintiff was not arrested, but rather

United States District Court

For the Northern District of California

1    handed his confession to Somoon and left the store.  Baptiste Depo., 210-211.

2          Somoon testified that based on the October 28, 2008, audit of the Market Street

3    Store, which showed missing merchandise, and plaintiff's confession, he suspended

4    plaintiff and recommended to HR and Mr. Nichols that the company terminate plaintiff's

5    employment.  On October 29, 2008, Somoon sent an email to Ms. Baird and to others

6    concerning his dealings with Baptiste on the previous day.  Baird Depo., 62-63, Exh. 8.  On

7    October 30, 2008, Somoon wrote to the HR Department and the Loss Prevention

8    Department, and to his supervisor Mr. Nichols, recommending that plaintiff be terminated.

9    Somoon Dep., 203-206; Exh. 8.

10         Ms. Baird made the decision to terminate plaintiff's employment.  Somoon Depo.,

11   96, 206; Exh. 3; Baird Depo., 51.  Somoon testified that at that time, he would go to Ms.

12   Baird "for any kind of termination approvals."  Somoon Depo., 206.  Mr. Nichols agreed that

13   plaintiff's termination was proper, "[b]ecause he had admitted taking the hats out of the

14   store without paying for them so that's theft and a terminable offense."  Nichols Depo., 95.

15   The termination was effective October 29, 2008.  Somoon Depo., 206; Baird Depo., 71-72;

16   Baptiste Depo., 196-199, Exh. 5.

17         Plaintiff filed an administrative charge with the EEOC on June 2, 2009.  The EEOC

18   conducted a lengthy investigation, and issued plaintiff a notice of right to sue on July 11,

19   2012.  The right-to-sue notice stated that the EEOC believed that violations of the statute(s)

20   had occurred, but that it had been unable to reach a settlement with Hat World, and had

21   decided not to bring suit itself against the respondent.  The right-to-sue notice advised

22   plaintiff that he had 90 days from the date of receipt of the notice to file suit.

23         Plaintiff filed the complaint in the present action on October 9, 2012, asserting two

24   causes of action against Genesco, Hat World, and Somoon – (1) racial discrimination and

25   harassment in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq.

26   ("Title VII"); and (2) racial discrimination and harassment in violation of 42 U.S.C. § 1981.

27   Hat World and Genesco now seek summary judgment, or in the alternative, partial

28   summary judgment, as does Somoon.

United States District Court

For the Northern District of California

**DISCUSSION**

A.     Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Id.  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion.  Anderson, 477 U.S. at 250; see also Fed. R. Civ. P. 56(c), (e).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

B.     Genesco/Hat World's Motion

Genesco and Hat World argue that summary judgment must be granted as to the claims against Genesco because it was not plaintiff's employer; and that summary judgment must also be granted as to the harassment and discrimination claims.

United States District Court
For the Northern District of California

1          1.     Dismissal of Genesco

2          Genesco/Hat World argue that summary judgment must be granted as to the claims

3   asserted against Genesco, because Genesco was not plaintiff's employer and because

4   plaintiff has provided no evidence supporting liability under any principle of agency.  The

5   court finds that the motion must be GRANTED.  Genesco/Hat World have provided

6   undisputed evidence that both plaintiff and Somoon were employed by Hat World, not

7   Genesco.  See Declaration of Carla Rodecap, ¶¶ 2-7.

8          In addition, Genesco cannot be held liable under agency principles because there is

9   no evidence that it delegated authority to Hat World to make employment decisions on its

10  behalf, or that it exercised the requisite control over Hat World.  See Swallows v. Barnes &

11  Noble Book Stores, Inc., 128 F.3d 990, 996 (9th Cir. 1997); Childs v. Local 18, Int'l B'hd of

12  Elec. Workers, 719 F.2d 1379, 1382-83 (9th Cir. 1981).  Nor can plaintiff show that

13  Genesco is an "indirect" employer, as there is no evidence that Genesco interfered with

14  plaintiff's employment with Hat World or had any control over plaintiff's relationship with Hat

15  World.  See E.E.O.C. v. Pacific Maritime Ass'n, 351 F.3d 1270, 1274 (9th Cir. 2003);

16  Anderson v. Pacific Maritime Ass'n, 336 F.3d 924, 926-31 (9th Cir. 2003).  Finally, plaintiff

17  cannot show that Genesco was a "joint" employer, since there is no evidence that Genesco

18  controlled the terms and conditions of plaintiff's employment with Hat World.  See Lopez v.

19  Johnson, 333 F.3d 959, 963-64 (9th Cir. 2003).

20         The evidence cited by plaintiff – such as the references to Genesco on Hat World

21  employees' employment application forms and paychecks, and in the LIDS Policy and

22  Procedure Manual – is insufficient to create a triable issue in light of the evidence regarding

23  corporate organization provided by Hat World, and plaintiff's concession in his deposition

24  that he was employed by Hat World.  Moreover, plaintiff has provided no evidence to

25  counter Genesco/Hat World's showing that Genesco has not delegated any authority to Hat

26  World, and has not retained any control over the terms and conditions of the day-to-day

27  work of Hat World's employees.  Plaintiff alleges no claims against Genesco, and does not

28  dispute that only Hat World had the authority to discipline or discharge Hat World

13

**United States District Court**
For the Northern District of California

1    employees or to supervise Hat World stores.

2         2.    Discrimination claim.

3         Plaintiff alleges discrimination on the basis of race, under both Title VII and § 1981.

4    Hat World argues that the discrimination claims fail because plaintiff cannot establish a

5    prima facie case, and also cannot show pretext.  The same legal principles are applied to

6    the analysis of § 1981 employment discrimination claims as to Title VII employment

7    discrimination claims.  Metoyer v. Chassman, 504 F.3d 919, 930 (9th Cir. 2007).

8         Title VII makes it "an unlawful employment practice for an employer" to "discriminate

9    against any individual with respect to" the "terms, conditions, or privileges of employment,

10   because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.

11   § 2000e–2(a).  A disparate treatment claim must be supported by direct evidence of

12   discrimination, or may instead be evaluated under the burden-of-proof-and production

13   analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See,

14   e.g., Hawn v. Executive Jet Management, Inc., 615 F.3d 1151, 1155 (9th Cir. 2010)

15   (applying McDonnell Douglas framework to Title VII discrimination claim); Metoyer, 504

16   F.3d at 930-31 (applying McDonnell Douglas framework to § 1981 discrimination claim).

17        Here, plaintiff has presented no direct evidence of disparate treatment by Hat World

18   based on race.  Thus, under the McDonnell Douglas analysis, he must first provide

19   sufficient evidence to establish a prima facie case of discrimination.  If he succeeds, the

20   burden shifts to Hat World to produce evidence of a legitimate, nondiscriminatory reason

21   for the adverse action.  If Hat World successfully carries that burden, the ultimate burden

22   shifts to plaintiff to raise a triable issue of material fact as to whether the proffered reasons

23   for the adverse action are a mere pretext for unlawful discrimination.  See Fonseca v.

24   Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 850 (9th Cir. 2004).  Notwithstanding the

25   burden-shifting, the ultimate burden of proof remains with plaintiff to show that Hat World

26   intentionally discriminated against him because of his race.  Coleman v. Quaker Oats Co.,

27   232 F.3d 1271, 1281 (9th Cir. 2000).

28        To establish a prima facie case of discrimination based on race, plaintiff must show

1   that he is a member of a protected class; that he was qualified for his position or was

2   performing satisfactorily; that he experienced an adverse employment action; and that

3   similarly situated individuals outside his protected class were treated more favorably, or

4   that some other circumstances surrounding the adverse employment action give rise to an

5   inference of discrimination.  See McDonnell Douglas, 411 U.S. at 802; Fonseca, 374 F.3d

6   at 847; see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

7        Hat World contends that plaintiff cannot establish a prima face case because he

8   cannot show that his work performance was completely satisfactory, and because there is

9   no evidence suggesting that discriminatory motive played a role in his termination.  With

10  regard to job performance, Hat World argues that the fact that plaintiff took hats outside the

11  store without paying for them – a clear violation of Company policy – establishes that his

12  job performance was not satisfactory.

13       With regard to evidence suggesting discriminatory motive, a plaintiff may show an

14  inference of discrimination "through comparison to similarly situated individuals, or any

15  other circumstances surrounding the adverse employment action [that] give rise to an

16  inference of discrimination."  Hawn, 615 F.3d at 1156.  Here, Hat World argues that there is

17  no such evidence pertaining to the reason plaintiff was terminated, and that in particular,

18  there is no evidence that similarly situated individuals outside of the protected class (i.e.,

19  employees outside the protected class who took hats outside the store) were treated

20  differently than plaintiff was.

21       Hat World also contends that even assuming plaintiff can meet the elements of the

22  prima facie case, Hat World had a legitimate nondiscriminatory reason for terminating him –

23  his admission to having taken hats from the Market Street Store without paying for them,

24  which is a terminable offense at Hat World.

25       Finally, Hat World asserts that plaintiff cannot demonstrate specific and substantial

26  evidence of pretext with regard to its articulated reason for terminating him.  Hat World

27  contends that plaintiff's only "evidence" is his testimony regarding the statements Somoon

28  is alleged to have made on the three occasions that he encountered plaintiff at the Market

**United States District Court**

For the Northern District of California

1    Street Store.  Baptiste Depo., 100, 108, 131, 137-138, 140, 171-172.  Hat World argues

2    that these comments are not sufficient to raise a triable issue as to whether Ms. Baird (the

3    final decisionmaker) terminated plaintiff because of his race, rather than for stealing hats,

4    since the comments were either not contemporaneous with the discharge or were not

5    causally related to the discharge decisionmaking process.  See Nesbit v. Pepsico, Inc., 994

6    F.2d 703, 705 (9th Cir. 1993).

7         In opposition, plaintiff argues that there is direct evidence of racial bias on the part of

8    Somoon, suggesting that the court need not employ the McDonald-Douglas shifting-

9    burdens analysis.  He points to Somoon's statement in July 2008 that "I don't like working

10   with you people . . . you are all thieves;" to Somoon's statement in September 2008, that

11   plaintiff was a "lazy thug," and that plaintiff "dressed ghetto," and to Somoon's use of the

12   word "nigger;" and to the statements by Somoon during the October 29, 2008 incident,

13   when Somoon again reportedly referred to "you people," and stated that plaintiff was "a

14   thief."

15        Plaintiff also points to comments Somoon made to Store Managers at other stores,

16   that they should keep an eye on a group of African-American kids, whom he allegedly

17   referred to as "those people" and "monkeys."  Deposition of Jay Figueroa ("Figueroa

18   Depo."), 59-65, 76-77.  In addition, plaintiff claims that Somoon objected to promoting

19   another African-American LIDS employee (again, at another store) "because he will steal"

20   and "black people are ghetto."  Figueroa Depo., 74-75; Declaration of Jay Figueroa

21   ("Figuera Decl.") ¶ 6; Deposition of Raymond Tabuena, 45-47, 15-18; Declaration of

22   Raymond Tabuena ¶ 6.

23        Plaintiff asserts that this "direct evidence" of Somoon's racial bias is sufficient to

24   create a triable issue as to the motivation of his employer.  Plaintiff contends that Somoon

25   was a "decisionmaker," and that the fact that he made discriminatory remarks is sufficient

26   to show that discriminatory animus played a role in the termination decision.

27        Apart from this, plaintiff also argues that Somoon is liable for racial discrimination

28   under the McDonnell-Douglas analysis.  First, he asserts that he meets the elements of the

**United States District Court**
For the Northern District of California

1   prima facie case, because he is a member of the protected class and was performing his

2   job in a satisfactory manner, based on the fact that both Mr. Pamatmat and Ms. Burket

3   testified he was a diligent employee, and the fact that he was promoted shortly after he was

4   hired and had received no verbal or written write-ups.  He also contends that he suffered an

5   adverse action (termination).

6        As for evidence that suggests a discriminatory motive, plaintiff argues (based on

7   Somoon's comments) that Somoon had a preconceived notion that Black people steal, and

8   that there is a triable issue as to whether Somoon took the actions he did based on his

9   racist beliefs.

10       Plaintiff also contends that he was terminated "based on lies" and that defendants'

11  "newly found reason for termination" is nothing but pretext.  Plaintiff claims that Somoon

12  falsely told Ms. Baird and Mr. Nichols that he (Somoon) had found missing hats in plaintiff's

13  bag, that plaintiff concealed hats in his backpack and then took them home, and that

14  plaintiff gave hats to his friends without receiving payment.  Plaintiff asserts that Somoon

15  made the decision to terminate him, and that that decision was "rubber-stamped" by Ms.

16  Baird without any investigation or discussion, based on the false accusations made by

17  Somoon.

18       However, plaintiff asserts, Ms. Baird did not have the truth in front of her when she

19  approved Somoon's decision.  Plaintiff argues that the previous Store Manager Mr.

20  Pamatmat had expressly authorized the employees to wear hats while working and to leave

21  the store premises while wearing the hats, to "push product when sales were down," so

22  long as they did not take the hats home.  Although plaintiff did not make this claim in his

23  own deposition, Pamatmat did confirm it in his deposition.  Pamatmat Depo., 48-49.

24  Plaintiff contends that stealing a hat is not the same as wearing a hat with the store

25  manager's authorization.

26       The court finds that the motion must be GRANTED.  First, plaintiff has not provided

27  direct evidence showing that he was terminated because of his race.  The evidence is

28  undisputed that Ms. Baird was the decisionmaker – not Somoon – and there is no evidence

that Ms. Baird or anyone else in HR was motivated by racial animus.  As for Somoon's

comments, while they may have been uncivil or offensive, most were race-neutral, and of

the few that were not, they are at most stray comments that were unrelated to plaintiff's

termination.  See Nesbit, 994 F.2d at 705 (supervisor's comment that company did not like

grey hair was not direct evidence of age discrimination, but rather was merely a stray

comment that was not tied to the plaintiff's termination); see also Nidds v. Schindler

Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996) (comment that is not directly tied to an

adverse action is not direct evidence of discrimination).

        With regard to the elements of the prima facie case, plaintiff is a member of the

protected class; he was arguably performing his job in a satisfactory manner, as there is no

evidence of unsatisfactory performance prior to the October 29 incident; and he suffered an

adverse action.   However, he has not provided any evidence that suggests that he was

terminated based on his race.  Again, Somoon's comments were stray comments, and are

not sufficient to show discriminatory animus related to his termination; and plaintiff's

reliance on claims by other employees as evidence that he himself was discriminated

against is unavailing, as none of those claims is sufficiently similar to plaintiff's claims.

        Nevertheless, the degree of proof required to make a prima facie showing in

opposition to a motion for summary judgment is "minimal and does not even rise to the

level of a preponderance of the evidence."   Raad v. Fairbanks North Star Borough School

Dist., 323 F.3d 1185, 1196 (9th Cir. 2003) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885,

889 (9th Cir. 1994)).  Thus, the court assumes for the sake of argument that plaintiff meets

the elements of the prima facie case.

        The burden then shifts to Hat World to articulate a legitimate, nondiscriminatory

reason for its actions.  Hat World has provided evidence showing that it had a legitimate

reason for terminating plaintiff.  That is, the October 29 store audit showed missing

merchandise, Somoon Depo., 148-149; Baptiste Depo., 163-164; Somoon searched the

store and found a bag containing hats with obvious signs of wear, which Ms. Burket

identified as belonging to plaintiff, Somoon Depo., 153-157; Watkins Depo., 25-27); plaintiff

United States District Court

For the Northern District of California

1  admitted to taking hats outside the store without paying for them, Baptiste Depo., 199-203;

2  Exh. 5; and Mr. Eisen was present when plaintiff handwrote a statement admitting to having

3  taken hats outside the store premises without paying for them, Baptiste Depo., 207; Exh. 5.

4       The evidence further shows that Hat World had a strict policy of terminating

5  employees who misappropriated Company merchandise.  Baird Depo., 38-39, 62; Exh. 8;

6  Nichols Depo., 95:13-19.  According to Hat World's Policy Procedure Manual, internal theft

7  is defined as theft of store merchandise, which includes the wearing of merchandise not

8  paid for, hiding merchandise, and/or removing merchandise from the store without paying

9  for it.  Somoon Depo., Exh. 4.  A copy of the internal theft policy is made available to all

10  employees, and was made available to plaintiff.  Baird Depo., 17.  In sum, Hat World has

11  provided evidence that the decision to terminate plaintiff was based on lawful,

12  non-discriminatory reasons.

13       Accordingly, the burden shifts to plaintiff to demonstrate that Hat World's proffered

14  reasons are pretextual.  "[A] plaintiff can prove pretext in two ways:  (1) indirectly, by

15  showing that the employer's proffered explanation is 'unworthy of credence' because it is

16  internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful

17  discrimination more likely motivated the employer."  Chuang v. University of Cal. Davis, Bd.

18  of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting Godwin v. Hunt Wesson, Inc.,

19  150 F.3d 1217, 1220-22 (9th Cir. 1998)).

20       The court finds that plaintiff has failed to raise a genuine dispute of material fact as

21  to whether defendants' legitimate, nondiscriminatory reason for terminating him was a

22  pretext for discrimination on the basis of race.  See Noyes v. Kelly Servs., 488 F.3d 1163,

23  1169-70 (9th Cir. 2007) (circumstantial evidence of pretext must be specific and

24  substantial).

25       A plaintiff may not defeat a motion for summary judgment by establishing a prima

26  facie case and then simply denying the credibility of the defendant's proffered reason for

27  the challenged employment action.  Wallis, 26 F.3d at 890; see also Munoz v. Mabus, 630

28  F.3d 856, 865 (9th Cir. 2010).  Nor may a plaintiff create a triable issue by relying solely on

United States District Court

For the Northern District of California

1   his subjective belief that the challenged employment action was unnecessary or

2   unwarranted.  Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1029 n.6 (9th Cir.

3   2006).

4        A plaintiff may establish pretext "'either directly by persuading the court that a

5   discriminatory reason more likely motivated the employer or indirectly by showing that the

6   employer's proffered explanation is unworthy of credence.'"  Villiarimo v. Aloha Island Air,

7   Inc., 281 F.3d 1054, 1062 (9th Cir. 2002) (quoting Burdine, 450 U.S. at 256).  If the plaintiff

8   offers direct evidence of pretext, "a triable issue as to the actual motivation of the employer

9   is created even if the evidence is not substantial."  Chuang, 225 F.3d at 1128.  Where

10  direct evidence is unavailable, however, circumstantial evidence to show pretext must be

11  both "specific and substantial."  Villiarimo, 281 F.3d at 1062; see also Noyes, 488 F.3d at

12  1169-70.

13       Here, while plaintiff claims he was fired because of "multiple lies propagated by

14  Somoon," his written confession provided a legitimate and non-discriminatory basis for his

15  termination, particularly given that he admitted in his sworn deposition that what he said in

16  the statement was true.  Plaintiff has provided no meaningful evidence indicating that Hat

17  World's proffered explanations were false or that anyone who made the decision to

18  terminate plaintiff harbored discriminatory animus towards plaintiff.  See Bradley v.

19  Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir. 1996).  Because plaintiff cannot show

20  that triable issues exist with regard to pretext, summary judgment must be granted as to

21  the discrimination claim.

22       3.    Harassment claims

23       Plaintiff asserts claims of harassment against Hat World, under both Title VII and

24  § 1981, which require proof of the same elements.  Johnson v. Riverside Healthcare Sys.,

25  LP, 534 F.3d 1116, 1122 n.3 (9th Cir. 2008).  The creation of a hostile work environment

26  through harassment is a form of proscribed discrimination under Title VII.  Oncale v.

27  Sundowner Offshore Servs., Inc., 523 U.S. 75, 78  (1998); Meritor Sav. Bank, FSB v.

28  Vinson, 477 U.S. 57, 64-65 (1986).  Hostile work environment claims based on racial

20

United States District Court

For the Northern District of California

1    harassment are reviewed under the same standard as those based on sexual harassment.

2    Faragher v. Boca Raton, 524 U.S. 775, 786-87 & n.1 (1998).

3         Under Title VII, to prove that a hostile environment based on race existed, the

4    plaintiff must show (1) that he was subjected to verbal or physical conduct because of his

5    race; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe

6    or pervasive to alter the conditions of his employment and create an abusive work

7    environment.  Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003); see

8    also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Fuller v. City of Oakland, Cal., 47

9    F.3d 1522, 1527 (9th Cir. 1995).

10        Hat World argues that summary judgment must be granted as to these claims

11   because the alleged harassment was not severe or pervasive, and because Hat World took

12   reasonable steps to prevent harassment and plaintiff failed to take advantage of the

13   corrective measures Hat World provided.

14        To determine whether conduct was sufficiently severe or pervasive to violate Title

15   VII, courts look at the totality of the circumstances, including "the frequency of the

16   discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

17   mere offensive utterance; and whether it unreasonably interferes with an employee's work

18   performance."  Harris, 510 U.S. at 23 (1993).  In addition, "[t]he working environment must

19   both subjectively and objectively be perceived as abusive."  Vasquez, 349 F.3d at 642

20   (quoting Brooks v. City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000)).

21        Subjectively, the evidence must show that the harassment is sufficiently severe or

22   pervasive to alter the conditions of the victim's employment and create an abusive working

23   environment.  See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004).  An

24   isolated comment will not suffice, but neither is psychological injury required.  Id. (citing

25   Harris, 510 U.S. at 22).  "It is enough 'if such hostile conduct pollutes the victim's

26   workplace, making it more difficult for her to do her job, to take pride in her work, and to

27   desire to stay on in her position.'"  Id. (quoting Steiner v. Showboat Operating Co., 25 F.3d

28   1459, 1463 (9th Cir. 1994)).

United States District Court

For the Northern District of California

1    Objectively, the court looks at "all the circumstances," including "the frequency of the

2   discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

3   mere offensive utterance; and whether it unreasonably interferes with an employee's work

4   performance." Harris, 510 U.S. at 23; see McGinest, 360 F.3d at 1113.  The analysis is

5   made from the perspective of a reasonable person belonging to the same racial or ethnic

6   group as the plaintiff.  Fuller, 47 F.3d at 1527.  The required level of severity or seriousness

7   varies inversely with the pervasiveness or frequency of the conduct.  Harris, 510 U.S. at 23;

8   McGinest, 360 F.3d at 1113.

9    Conduct that is not severe or pervasive enough to create an objectively hostile or

10   abusive work environment is beyond Title VII's purview.  Harris, 510 U.S. at 21-22; see also

11   Vasquez, 349 F.3d at 642-44; Manatt v. Bank of America, N.A., 339 F.3d 792, 798 (9th Cir.

12   2003); Kortan v. California Youth Auth., 217 F.3d 1104, 1110 (9th Cir. 2000); Sanchez v.

13   City of Santa Ana, 936 F.2d 1027, 1031-37 (9th Cir. 1990).  Neither "simple teasing,"

14   "offhand comments," nor "isolated incidents" alone can constitute a hostile work

15   environment.  Faragher, 524 U.S. at 788.  The "mere utterance of an . . . epithet which

16   engenders offensive feelings in an employee" does not alter the employee's terms and

17   conditions of employment.  Meritor Sav. Bank, 477 U.S. at 65-67 (citations and quotations

18   omitted).  Rather, the workplace must be "permeated with 'discriminatory intimidation,

19   ridicule, and insult.'"  Harris, 510 U.S. at 21.

20    Hat World asserts that even if plaintiff's allegations regarding Somoon's comments

21   are true, the comments constitute the very type of isolated incidents that are insufficient to

22   establish severe or pervasive harassment.  Hat World contends that isolated incidents,

23   spread well apart in time, are insufficient to establish that the workplace is permeated with

24   discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter

25   the conditions of the victim's employment and create an abusive working environment.

26   Moreover, Hat World asserts, plaintiff's own testimony confirms that he did not experience

27   harassment on the basis of race that was sufficient to alter the conditions of his

28   employment and create an abusive working environment.

**United States District Court**

For the Northern District of California

1   For example, with regard to the alleged racial slur, Hat World notes that plaintiff

2   testified that he himself used the word "nigga" – in particular on his Facebook page – and

3   that he conceded that he did not believe that term necessarily referred to a person being

4   Black or that it even referenced race, and he did not always consider the term to be

5   derogatory.  Baptiste Depo., 39-43, 298-303, Exhs. 16-19.  In addition, other Hat World

6   employees admitted using the word "nigga."  Figueroa Depo., 212-213.

7   Hat World argues further that even after the two alleged meetings with Somoon in

8   July and September 2008, plaintiff turned down an offer of employment from his former

9   Store Manager, Mr. Pamatmat, to work at another company.  Plaintiff testified that he did

10  not accept the offer because he did not anticipate that he would be encountering Somoon

11  frequently (as Somoon was a District Manager who visited many stores), and also because

12  he was "comfortable" at Hat World.  Baptiste Depo., 146-150.  Moreover, plaintiff testified

13  that he never looked for or applied for any other jobs between the time he first met Somoon

14  and the time of his termination.  Baptiste Depo., 179-180.  Hat World contends that this

15  testimony shows that plaintiff was not experiencing any severe or pervasive harassment

16  that altered the terms and conditions of his employment.

17  Finally, Hat World asserts it cannot be held liable for harassment, based on the

18  Ellerth/Faragher defense.  In Faragher and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742

19  (2008), the Supreme Court established a framework for determining when an employer

20  may be held liable for its employee's creation of a hostile work environment.  The Court

21  held that an employer can be vicariously liable under Title VII for harassment by an

22  employee given supervisory authority over subordinates – that an employer is strictly liable

23  for supervisor harassment that "culminates in a tangible employment action, such as

24  discharge, demotion, or undesirable reassignment."  See Vance v. Ball State Univ., 133

25  S.Ct. 2434, 2455-56 (2013) (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 808).  But

26  when no tangible employment action is taken, the employer may raise an affirmative

27  defense to liability, which requires a showing that the employer exercised reasonable care

28  to prevent and correct promptly any sexually harassing behavior, and that the plaintiff

23

United States District Court
For the Northern District of California

employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Ellerth, 524 U.S. at 765; accord Faragher, 524 U.S. at 807.

Here, Hat World asserts, both elements are met, as the evidence shows that it took reasonable steps to prevent and correct workplace harassment and provided plaintiff with a copy of its Anti-Harassment Policy at the outset of his employment, and also provided anti-harassment training to its supervisors; and that plaintiff unreasonably failed to use the preventive and corrective measures offered, as he never complained about Somoon, and never reported any incident of harassment to Human Resources, the Store Manager, or the Regional Manager.  See Baptiste Depo., 31-34, 119, 122, 247-248; Exhs. 1, 3; Baird Decl. ¶ 6.

In opposition, plaintiff asserts that Hat World is liable for racial harassment, and that the abusive conduct need not be both severe and pervasive – that one or the other will do. Plaintiff appears to have conceded that the alleged harassment was not "pervasive."  He argues, however, that the word "nigger" is considered an extremely offensive racial term, and suggests that the single incident in September 2008 when allegedly Somoon whispered  the word into is ear is sufficient by itself to constitute "severe" harassment.

As for defendants' argument that the alleged harassment was limited to offensive statements made on three separate dates, plaintiff contends that the October 29 incident alone should be sufficient to support his claim of harassment, as he claims that Somoon falsely accused him of theft; interrogated him while yelling at him; insulted him by calling him a "piece of shit," a "liar," and a "thief;" "screamed racial epithets at [p]laintiff and his mother;" and called the police when plaintiff would not complete the written statement as Somoon was demanding.

As for the other two incidents, plaintiff reiterates that Somoon told him the first day they met in July 2008 that he did not like working with "you people" because "you're all thieves;" that in September 2008 Somoon called him "lazy" and "a thug," and said he "dressed ghetto," and also that Somoon used the word "nigger."  Plaintiff takes issue with

24

Somoon's claim that words such as "you people" and "ghetto" are race-neutral, arguing that they are in fact "code words" that evidence racial animus.  Plaintiff claims that these "slurs and insults" caused him great distress, that he went to work every day with the fear he would lose his job, and that Somoon's conduct caused him to be offended, depressed, and upset, and to have trouble sleeping.

With regard to the Ellerth/Faragher defense, plaintiff contends that this defense applies only when no tangible employment action is taken against the plaintiff.  He argues that here, the fact that he was terminated by Somoon forecloses any application of the defense.

The court finds that the motion must be GRANTED.  Plaintiff has failed to provide evidence sufficient to create a triable issue as to whether he was subjected to unwelcome verbal or physical conduct because of his race, and as to whether the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.

Title VII imposes no "general civility code."  Oncale, 523 U.S. at 81.

It does not reach "the ordinary tribulations of the workplace," for example, "sporadic use of abusive language" or generally boorish conduct.  B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). See also 1 B. Lindemann & P. Grossman, Employment Discrimination Law 1335-1343 (4th ed. 2007). . . . To be actionable, charged behavior need not drive the victim from her job, but it must be of such severity or pervasiveness as to pollute the working environment, thereby "alter[ing] the conditions of the victim's employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 [1993].

Vance, 133 S.Ct. at 2455.

In subjective terms, plaintiff's failure to complain to any supervisor or anyone in HR about Somoon's behavior, and his decision that he preferred to stay on at Hat World because he was "comfortable" there rather than accept Mr. Pamatmat's offer of employment at another retail establishment, cuts against any claim that Somoon's comments in July and September created an abusive environment.  The October 29 events, while unpleasant, revolved around Somoon's accusation that plaintiff had stolen hats, not around any harassment based on race.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    In objective terms, plaintiff has not alleged sufficient race-based comments to

2  support a claim of workplace harassment.  As an initial matter, plaintiff saw Somoon on

3  only three occasions during his period of employment – In July, Somoon was in the store

4  for only an hour; in September, he was there for approximately three to four hours; in

5  October, he was there for most of the day, engaged in the inventory and dealing with

6  plaintiff.  These limited contacts are not sufficient to show "pervasiveness."

7    In addition, plaintiff does not claim that Somoon did anything other than make a few

8  comments – some of which were not even race-based.  The only clearly race-based

9  comment was the one incident when Somoon whispered "nigger" in plaintiffs ear.  While

10  undisputedly offensive, Somoon's single use of the word "nigger" is insufficient to establish

11  harassment on the basis of race.

12    "[C]onduct must be extreme to amount to a change in the terms and conditions of

13  employment."  Faragher, 524 U.S. at 788; see, e.g., Alvarado v. FedEx Corp., 2006 WL

14  644875 at *15-16 (N.D. Cal. Mar. 13, 2006) (supervisor's use of single racial slur held

15  insufficient to create a hostile work environment, even when considered in context of

16  supervisor's constant negative criticisms, and statements that plaintiff was too slow and fat

17  to work for the employer); Hercules v. Department of Homeland Sec., 2008 WL 1925193 at

18  *20-21 (N.D. Cal. Apr. 29, 2008) (supervisor's use of "bitch" and "nigger" on two separate

19  occasions, possibly directed at plaintiff, and making of occasional derogatory comments in

20  the presence of plaintiff's co-workers, to the effect that plaintiff was "not going nowhere"

21  and was "not going to do anything," and would never be promoted, held insufficient to

22  establish a continuous, pervasive pattern of racial slurs); Stevens v. County of San Mateo,

23  2006 WL 581092 at *5-6 (N.D. Cal. Mar. 7, 2006) (isolated and sporadic age- and race-

24  based comments directed at the plaintiff, such as "stupid old man," "old barking dog," "old

25  gangster," and "you're my nigger" were insufficiently severe or pervasive to alter the terms

26  and conditions of employment).

27    The phrase "you people," while perhaps offensive to some members of the

28  community, does not on its face directly suggest racial animus, and is at most a stray

26

United States District Court

For the Northern District of California

remark.  See DeHorney v. Bank of Am. Nat. Trust & Sav. Ass'n, 879 F.2d 459, 467 (9th Cir.

1989) (ambiguous reference to "you people" held insufficient to serve as evidence of racial

motivation); see also Zavala v. Barnik, 545 F.Supp. 2d 1051, 1058 (C.D. Cal. 2008) (the

phrase "you people" does not, in and of itself, evidence racial or discriminatory animus).

The reference to "dressing ghetto" perhaps carries more of a racial connotation, but it is

also vague and ambiguous.  Further, Somoon is alleged to have said that to plaintiff on only

one occasion.  The remainder of the comments – that plaintiff was lazy, and that he was a

thief – are race-neutral.

There is no evidence that Somoon told plaintiff he did not want to work with him

because of his race, or that Somoon made "multiple race related comments" as plaintiff

claims in his opposition.  The type and frequency of the conduct alleged here does not

even rise to the level of the conduct alleged in Vasquez, Manatt, and Sanchez – which the

Ninth Circuit found not sufficiently severe and pervasive to constitute harassment.  See

Vasquez, 349 F.3d at 642-44 (comments by supervisor of plaintiff deputy probation officer

that he had "a typical Hispanic macho attitude" and was a "juvenile delinquent;" and that he

should work in the field because "Hispanics do good in the field;" plus negative remarks

and complaints made about the plaintiff and yelling at the him – held insufficient to create a

hostile work environment); Manatt, 339 F.3d at 795-99 (co-workers' use of the term

"China-man," ridicule of the plaintiff's mispronunciation of English words, statement that

"I've had the worst kind of trouble with your countrymen," using gestures mocking the

appearance of Asians – held to be insufficient to create a hostile work environment);

Sanchez, 936 F.2d at 1031-37 (posting of racially offensive cartoon at police station,

making of racially offensive slurs, targeting of Latino police officers when enforcing rules,

providing unsafe vehicles to Latino officers, failure to provide adequate police backup to

Latino officers, and maintaining of illegal personnel files on plaintiffs because they were

Latino – held to be insufficient to create a hostile work environment).

Because plaintiff has failed to provide evidence sufficient to raise a triable issue with

regard to harassment on the basis of race, the court need not address the issue of the

United States District Court

For the Northern District of California

1  Ellerth/Farragher defense – which in any event is not applicable when the supervisor's

2  harassment is alleged to have culminated in a tangible employment action, such as

3  discharge, demotion, or undesirable reassignment.  See Ellerth, 524 U.S. at 765.[3]

4  C.    Michael Somoon's Motion

5       Somoon argues that he cannot be held individually liable under Title VII; and that

6  plaintiff cannot prove discrimination or harassment under § 1981.[4]

7       1.    Individual liability under Title VII

8       Somoon asserts that he cannot be held liable under Title VII, because Title VII "does

9  not provide a separate cause of action against supervisors or co-workers."  Craig v. M & O

10 Agencies, Inc., 496 F.3d 1047, 1058 (9th Cir. 2007).  Here, the complaint alleges that

11 Somoon was one of plaintiff's supervisors, and that only Hat World and Genesco were his

12 "employers."

13      In opposition, plaintiff concedes that Somoon cannot be liable for monetary relief for

14 discrimination or harassment under Title VII.  However, he asserts that Somoon can be

15 subject to injunctive relief under Title VII, such as an order to cease and desist from all

16 harassing conduct.  He notes that he has requested injunctive relief in his complaint.

17      Somoon's motion for summary judgment as to the Title VII claim is GRANTED.

18 Title VII does not provide a cause of action for damages against supervisors or individual

19 employees.  Holly D. v. California Inst. of Tech., 339 F.3d 1158, 1179 (9th Cir. 2003); see

20 also Miller v. Maxwell's Int'l Inc., 991 F.2d 583, 587-88 (9th Cir. 1993).  Plaintiff's argument

21 that he can still get injunctive relief against Somoon, "such as an order to cease and

22 desist," is to no avail, given that Title VII is directed at discrimination, harassment, and

23 retaliation in the workplace, and neither plaintiff nor Somoon is currently employed by Hat

24

25      [3]  Hat World contends in its reply brief that under Jones v. R.R. Donnelley, 541 U.S.

26 369, 371-72 (2004), any § 1981 claim based on the incidents that occurred prior to October
   9, 2008 (four years before the complaint was filed) is time-barred.  However, the court has not

27 considered this argument, as it was not mentioned in Genesco/Hat World's moving papers.

28      [4]  Somoon also argues that plaintiff's claims are barred by the doctrine of laches.
   However, the court finds it unnecessary to address that argument.

United States District Court

For the Northern District of California

1   World.[5]

2       2.    Section 1981 discrimination claim

3       Somoon argues that plaintiff cannot prove discrimination under § 1981.  First, he

4   asserts, based on Jones, 541 U.S. at 371-72, that any claim based on conduct that

5   occurred prior to October 9, 2008 (four years before the date plaintiff filed the complaint) is

6   time-barred.  Moreover, he argues, discrete discriminatory acts are not actionable if time-

7   barred, and each discrete discriminatory act starts a new clock for filing charges alleging

8   that act.  See Morgan, 536 U.S. at 113.  A "mere continuing impact from past violations is

9   not actionable." Knox v. Davis, 260 F.3d 1009, 1013 (9th Cir. 2001).

10      Second, Somoon contends that the events of October 29, 2008 cannot support a

11  claim for discrimination because he acted with a legitimate business reason in

12  recommending that plaintiff be terminated.  As noted above, analysis of a § 1981

13  employment discrimination claim follows the same legal principles as analysis of a Title VII

14  discrimination claim.  Metoyer, 504 F.3d at 930.  Here, the court assumes for the sake of

15  argument that plaintiff has met the minimal burden of establishing a prima facie case.

16  Thus, the burden shifts to Somoon to show that he acted with a legitimate business

17  purpose in recommending that plaintiff be terminated.

18      Somoon asserts that his recommendation regarding the termination was

19  nondiscriminatory and legitimate, in view of plaintiff's written statement admitting that he

20  had taken hats from the store "without paying for them," which he knew was against

21  company policy, and based on the fact that Somoon had just conducted an inventory which

22  revealed that dozens of hats were missing.  In addition, Somoon provides evidence

23  showing that Hat World had a "zero tolerance" policy with regard to employee theft.

24      In opposition, plaintiff makes essentially the same arguments as he did with regard

25  to the motion of Genesco/Hat World.  First, plaintiff asserts that there is direct evidence of

26  racial bias on the part of Somoon, pointing to the statements made by Somoon in July,

27

28

---

[5] Subsequent to plaintiff's termination, Somoon was also fired for stealing hats.

29

United States District Court

For the Northern District of California

1    September, and October 2008, and to the statements reported by Mr. Figueroa and Mr.

2    Tabuena, as discussed above.  Plaintiff contends that these comments constitute "direct

3    evidence" of Somoon's racial bias, and that because Somoon was a "decisionmaker," the

4    fact that he made discriminatory remarks is sufficient to show that discriminatory animus

5    played a role in the termination decision.

6         Second, plaintiff argues that Somoon is liable for racial discrimination under the

7    McDonnell-Douglas analysis.  Plaintiff contends that he meets the elements of the prima

8    facie case, as he is a member of the protected class; was performing his job in a

9    satisfactory manner; and suffered an adverse action.  As for evidence that suggests a

10   discriminatory motive, plaintiff argues that Somoon appears to have had a preconceived

11   notion that Black people steal.  Plaintiff contends that there is clearly a triable issue as to

12   whether Somoon took the actions he did based on his racist beliefs.

13        Plaintiff asserts further that defendants' reason for his termination is nothing but

14   pretext.  Plaintiff claims that Somoon falsely told Ms. Baird and Mr. Nichols that he

15   (Somoon) had found missing hats in plaintiff's bag, that plaintiff concealed hats in his

16   backpack and then took them home, and that plaintiff gave hats to his friends without

17   receiving payment.  Plaintiff asserts that Somoon "made the decision" to terminate him, and

18   that that decision was "rubber-stamped" by Baird without any investigation or discussion,

19   based on the false accusations made by Somoon.

20        However, plaintiff asserts, Ms. Baird did not have the truth in front of her when she

21   approved Somoon's decision.  Plaintiff argues that the previous Store Manager, Mr.

22   Pamatmat, had expressly authorized the employees to wear hats while working and to

23   leave the store premises while wearing the hats, to "push product when sales were down,"

24   so long as they did not take the hats home.  Mr. Pamatmat's deposition testimony confirms

25   this.  Pamatmat Depo., 48-49.

26        The court finds that the motion must be GRANTED.  For the reasons stated above

27   with regard to Hat World, the court finds that plaintiff has failed to establish through direct

28   evidence that he was terminated based on his race; and finds further that he has not

United States District Court
For the Northern District of California

1   provided evidence sufficient to meet his ultimate burden under the McDonnell-Douglas

2   analysis.

3       Assuming for the sake of argument that plaintiff satisfies the elements of the prima

4   facie case, the court finds that he has failed to raise a genuine dispute of material fact as to

5   whether defendants' legitimate, nondiscriminatory reason for terminating him was a pretext

6   for discrimination on the basis of race.

7       It is undisputed that the sole adverse action alleged is plaintiff's termination.

8   Plaintiff's employment was terminated only after HR approved the recommendation to

9   terminate, and thus was not a final decision made by Somoon.  See Baird Depo., 51;

10  Somoon Depo., 96, 203-206.  Plaintiff provides no evidence to support his claim that Ms.

11  Baird simply "rubber-stamped" Somoon's recommendation, and no evidence showing that

12  Ms. Baird's decision was heavily influenced by false information provided by Somoon.  It is

13  undisputed that Ms. Baird was the final decisionmaker, not Somoon.  Thus, Somoon cannot

14  be held liable based on the termination.

15      Moreover, plaintiff's evidence does not establish that Somoon discriminated against

16  him on the basis of race, or even create a triable issue.  Plaintiff has provided no evidence

17  showing that Somoon treated him any differently than any employee outside the protected

18  class, or that Somoon was motivated by racial animus when he made the recommendation

19  that plaintiff be terminated.  Plaintiff admitted he took hats without paying for them, and his

20  written statement defeats any claim that he was terminated because of his race.

21      3.      Section 1981 harassment claim

22      Somoon argues that summary judgment must be granted as to the § 1981

23  harassment claim because plaintiff cannot show that Somoon's actions, even if they

24  occurred as he alleges, were sufficiently severe or pervasive to alter the terms and

25  conditions of plaintiff's employment.

26      As set forth above, plaintiff makes the following accusations with regard to his three

27  encounters with Somoon:  First, in July 2008, Somoon said he did not like working with

28  "you people," and that "you are all thieves."  He was not looking at plaintiff when he said

United States District Court

For the Northern District of California

1    this.  Second, in September 2008, Somoon called plaintiff a "lazy thug" and said he

2    "dressed ghetto," and he whispered the word "nigger" when walking past plaintiff.  Third, on

3    October 29, 2008, Somoon made "some kind of derogatory comment" about plaintiff and

4    accused him of stealing hats.

5         Somoon argues that this conduct, even if it occurred as plaintiff claims, was not

6    sufficiently severe, frequent or pervasive to alter the terms and conditions of plaintiff's

7    employment at Hat World.  As plaintiff's testimony indicates, he spent no more than nine

8    hours in Somoon's company over a four-month period.  Somoon asserts that plaintiff simply

9    cannot show that his workplace was "permeated" with harassment and intimidation

10   because of his race, and thus, he cannot meet his burden of proof on his claim for

11   harassment under § 1981.

12        Somoon notes that plaintiff alleges no physical threats or psychological intimidation,

13   and that none of the objectionable comments are alleged to have been made in the

14   presence of other employees or customers.  Somoon also asserts that some of the

15   comments plaintiff claims Somoon made can be considered ambiguous, such as the

16   reference to "you people," which is not necessarily a reference to African-Americans.

17   Finally, Somoon contends that there is nothing in the record to suggest that the alleged

18   "harassment" interfered with plaintiff's ability to do his job.  He remained a "Third Key" and

19   continued to work as he had been, despite the comments Somoon allegedly made in July

20   and September.

21        Plaintiff makes essentially the same arguments in opposition to Somoon's motion as

22   he made in opposition to the motion filed by Genesco/Hat World.  He argues that the

23   abusive conduct need not be both severe and pervasive – that one or the other will do; that

24   the word "nigger" is an extremely offensive racial term, and that the single use of this word

25   can be sufficient to constitute "severe" harassment; and that the other comments made in

26   July, September, and October 2008 are sufficient to support his claim for harassment.  He

27   asserts that these "slurs and insults" caused him great distress, that he went to work every

28   day with the fear he would lose his job, and that Somoon's conduct caused him to be

1   offended, depressed, and upset, and to have trouble sleeping.

2       The court finds that the motion must be GRANTED.  As with the claim against Hat

3   World, the question is whether the alleged harassment was sufficiently severe or pervasive

4   to alter the conditions of plaintiff's employment and create an abusive work environment.

5   For the reasons stated above, the court finds that plaintiff has failed to establish that his

6   working environment was either subjectively or objectively abusive.

7       In particular, the scattered comments Somoon is alleged to have made on the three

8   occasions when he and plaintiff met are not sufficient to support a claim for hostile work

9   environment.  A majority of the comments Somoon made were arguably not race-based,

10  and the only comment that was clearly race-based was the single use of the word "nigger."

11  The phrase "you people" does not in itself clearly connote racist animus, nor does the

12  reference to "dressing ghetto."  The remainder of the comments – basically that plaintiff

13  was lazy, and that he was a thief – are race-neutral.

14                                **CONCLUSION**

15      In accordance with the foregoing, defendants' motions for summary judgment are

16  GRANTED.

17      In addition, plaintiff's request for leave to file a sur-reply is DENIED; plaintiff's

18  objections to evidence are OVERRULED; and plaintiff's motion to file under seal Exhibit 34

19  to the Declaration of Derek C. Decker in opposition to Genesco/Hat World's motion for

20  summary judgment is DENIED, defendants having failed to file a declaration in support of

21  the motion, as required by Civil Local Rule 79-5(e).

22

23  **IT IS SO ORDERED.**

24  Dated:  February 5, 2014

25                                          _____
                                            PHYLLIS J. HAMILTON
26                                          United States District Judge

27

28

United States District Court
For the Northern District of California